UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

YAQUELIN VARGAS,

                              Plaintiff,

          - against -

THE CITY OF NEW YORK, and NEW YORK
CITY POLICE DEPARTMENT ARTICLE II
MEDICAL BOARD,

                              Defendants.

**OPINION AND ORDER**

15 Civ. 8016 (ER)

Ramos, D.J.:

Plaintiff Yaquelin Vargas bring this action against Defendants the City of New York and

New York City Police Department Article II Medical Board (the "Medical Board"), alleging

employment discrimination on the basis of her disability and retaliation for challenging a New

York Police Department ("NYPD") policy that discriminated against the hearing impaired.

Plaintiff brings her claims pursuant to the Americans with Disabilities Act ("ADA") and the New

York City Human Rights Law ("NYCHRL").

Before the Court is Plaintiff's motion to amend the Complaint pursuant to Federal Rule

of Civil Procedure 15(d).  For the reasons stated below, Plaintiff's motion is DENIED.

I. **Background**[1]

Plaintiff joined the NYPD as an officer in 2007.  Supp. Compl. ¶ 16.  On September 13,

2011, Plaintiff sustained ringing and pain in her right ear while participating in a scheduled

---

[1] For ease of reference, the following factual background is based on allegations in the Supplemental Complaint
("Supp. Compl.") (Doc. 31), Ex. 1, which mirror the original Complaint, (Doc. 5), except with respect to the claims
regarding the NYPD's new policy.  The Court accepts the allegations in the Supplemental Complaint as true for

firearms training exercise.  *Id.* at ¶ 32.  On September 22, 2011 Plaintiff was diagnosed with severe-to-moderately severe sensorineural hearing loss in her right ear, *id.* at ¶ 34, and approximately two weeks later, was placed on restrictive duty, *id.* at ¶ 36.

At the time of Plaintiff's injury, the NYPD maintained a policy requiring officers "to possess normal hearing without the use of hearing aids."  *Id.* at ¶ 23.  Plaintiff alleges that as a result, not only was she placed on restricted duty, but she was also subjected to a number of tests and consultations.  Specifically, after reporting her injury, on October 5, 2011, Plaintiff was directed to the NYPD Medical Division[2] for a pure tone audiometric test to measure her ability to hear tones at certain designated levels of intensity and in different frequencies.  *Id.* ¶¶ 36, 38. After these tests confirmed hearing loss, on October 21, 2011, Plaintiff was directed to the Center for Hearing and Communication ("CHC"), a private healthcare provider, for further evaluation.  *Id.* at ¶ 39.  The CHC also confirmed Plaintiff's hearing loss and suggested that Plaintiff use a hearing aid.  *Id.* at ¶¶ 40-41.  On November 22, 2011, Plaintiff was directed to report to a different doctor at the NYPD Medical Division to whom she presented a letter from her private doctor regarding her need for a hearing aid.  *Id.* at ¶ 44.

On December 12, 2011, the doctor at the NYPD Medical Division directed Plaintiff to a different doctor at the NYPD Medical Division to undergo another pure tone audiogram hearing examination, which confirmed that there had been no change in her hearing loss.  *Id.* at ¶¶ 47-48.

---

purposes of the instant motion.  *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).  Plaintiff has also submitted several exhibits with her motion, *see* Doc. 31, of which the Court may take judicial notice, because they are documents filed in court.  *See Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991)  ("[C]ourts routinely take judicial notice of documents filed in other litigation, . . . not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings.").

[2] Defendant Medical Board maintains its offices within the NYPD Medical Division located in Queens, New York. Supp. Compl. ¶ 27.

As a result of this examination, Plaintiff was told that she could not work with a hearing aid and that she would be processed for involuntary retirement due to her disabling hearing loss. *Id.* at ¶¶ 49, 51.

Two months later, on February 15, 2012, Plaintiff was fitted for a hearing aid by her private audiologist. *Id.* at ¶ 53. She was then directed to see the Deputy Chief Surgeon at the NYPD Medical Division, who told Plaintiff that she would have to be evaluated by an NYPD consultant. *Id.* at ¶¶ 54-55. Plaintiff was seen by the consultant approximately nineteen months later, on October 29, 2013, who conducted a series of tests on her while she wore her hearing aid. *Id.* at ¶ 57. Less than two weeks later, on November 8, 2013, the consultant provided the results and made written recommendations to the NYPD. Plaintiff alleges that the consultant refused to provide her with a copy of the results. *Id.* at ¶ 59. On December 19, 2013, based on the consultant's recommendations, the NYPD Chief Surgeon recommended that Plaintiff be separated from police service. *Id.* at ¶ 60.

On January 31, 2014, the Deputy Chief Surgeon referred Plaintiff to an otolaryngologist at Weill Cornell Physicians for an audiological evaluation. *Id.* at ¶ 61. Less than one week later, on February 5, 2014, Plaintiff was examined by the otolaryngologist, who confirmed her right-sided hearing loss and noted that a conventional hearing aid would most likely give Plaintiff the ability to localize sound in her environment. *Id.* at ¶¶ 63, 64. The otolaryngologist submitted these results to the NYPD Medical Division. Plaintiff claims that despite these results, she was not reinstated to full duty status. *Id.* at ¶¶ 65-66. On March 14, 2014, the Medical Board determined that the evidence presented before it demonstrated that Plaintiff was unable to perform police duties and recommended that she be separated from police service. *Id.* at ¶ 68.

While Plaintiff was undergoing the series of tests, two police officers brought an action in district court challenging the NYPD's hearing aid ban. *See Phillips v. City of New York*, No. 11 Civ. 6685 (KPF).  The parties reached a settlement agreement on June 11, 2015 in which the City agreed to reevaluate the NYPD's hearing requirements for incumbent officers and allowed officers wearing hearing aids to continue working if, after testing at the CHC, they met certain hearing standards.  Declaration of Colleen M, Meenan in Support of Plaintiff's Motion for Leave to Supplement Her Complaint ("Meenan Decl.") (Doc. 31), Ex. 2, ¶¶ 3-4.[3]  The District Court retained jurisdiction over the matter for a period of nine months to "ensure that the City's re-evaluation of the NYPD's hearing aid policy occur[ed] in good faith and in a timely manner." *Id.* at ¶ 12.[4]

In accordance with the settlement, the NYPD undertook a review of its hearing aid ban policy and found that in certain circumstances, officers with hearing disabilities would be able to perform the essential functions of a full duty officer with the assistance of a hearing aid.  Meenan Decl., Ex. 3, at 6-7.[5]  As a result, in December 2015, the NYPD changed its policy from a

---

[3] Notably, the settlement allowed one of the plaintiffs to be tested with a hearing aid by the CHC and reinstated to full duty if he met certain hearing requirements.  It also specifically provides that the reinstated plaintiff "shall not be required to be tested again under the re-evaluated or newly adopted policy unless he incurs additional hearing loss."  Meenan Decl., Ex. 3, at 4.

[4] Plaintiff also alleges that she was retaliated against for participating as a witness in the *Phillips* case.  Supp. Compl. ¶ 77.  Plaintiff provided a declaration in support of the claims raised by those plaintiffs that they were being discriminated against by the NYPD due to their hearing loss.  *Id.* at ¶ 78.

[5] Those functions include speech discrimination with and without noise, sound localization, detection of non-speech sounds, and communication through high or low fidelity communication systems.  In its review, the NYPD found that hearing loss affects performance and that hearing aids do not restore localization abilities.  However, it acknowledged that it did not know what level of performance was required "for adequate safe/effective performance, how much deficit hearing would present an acceptable risk and how well hearing aids can close the gap in cases of sensory deficit."  Consequently, it decided that a case-by-case assessment was necessary.  Meenan Decl., Ex. 3, at 7.

complete ban to a case by case determination of whether an officer who has suffered hearing loss can perform the essential functions necessary for full-duty police work.  *Id.* at 6.

As described by the NYPD, the new policy would require an officer who has suffered hearing loss to undergo a two-step process before he can be reinstated to full time status.  First, the officer must go through an initial assessment to confirm hearing loss and the need for a hearing aid.  Second, an officer who is found to require a hearing aid must undergo a series of tests that will enable the Medical Board to determine whether the officer is able to perform the essential functions of an officer while using a hearing aid.  *Id.* at 8.  For the initial assessment, the NYPD refers the officer to the NYPD Medical Division for an audiometric screening.[6]  This screening is conducted without the use of a hearing aid, but an officer who fails to meet the required medical hearing standards can elect to be tested with one.  *Id.*

If an officer does not pass the initial screening (without a hearing aid), the officer must undergo additional testing.  This additional testing is governed by a section entitled, "Testing Requirements for NYPD Auditory Assessments For Those Members Who Did Not Pass The Initial Screening" ("Auditory Assessment").  Although the Auditory Assessment does not list the specific tests that an officer must undergo, it provides a list of the "minimum test results" that must be presented to the Medical Board for evaluation.  *Id.* at 9.

Upon completing the tests, the officer must submit the results to the Medical Board, which will provide the officer "with an individualized assessment of his or her auditory ability as

---

[6] Audiometric screening presents "tones at designated frequencies, to each ear separately, at the pass/failed designated levels" and identifies a time synchronized response from the officer being tested.  Meenan Decl. Ex. 3, at 8.  The "General Procedure" section provides that "[p]ure tone thresholds of audibility shall not exceed the decibel limits set by the NYPD hearing standards in either the left or right ears at the following audiometric frequencies: 500Hz, 1000Hz, 2000Hz, 3000Hz, 4000Hz, and 6000Hz."  *Id.*

it relates to the essential functions necessary for full duty uniformed service." *Id.* at 10.  The policy does not include a threshold requirement that an officer must meet, but rather states only that the assessment is made "in consultation with expert(s) in the field, and shall be consistent with the job-related essential functions and critical tasks" of officers.  *Id.*  The Medical Board also reserves the right to send the officer "for further testing in the event that, among other things, there is a need to ensure the accuracy of test results."  *Id.* at 10 n.5.  An officer who uses a hearing aid is also required to provide "written certification indicating that there has been no deterioration in hearing ability *or* indicating the changed level of hearing loss," from a licensed audiologist every two years while on full duty.  *Id.* at 10 (emphasis added).

Plaintiff proposes amending the Complaint to include claims challenging this new policy.  Specifically, Plaintiff alleges that the new policy discriminates against hearing disabled officers because it lacks "specific objective measures of functional hearing" and thus does not test or assess an officer for the hearing required to perform the necessary functions of the job.  Supp. Compl. ¶¶ 105, 115.  Additionally, Plaintiff claims that the recertification requirement treats hearing disabled officers differently than non-hearing disabled officers because recertification applies only to hearing disabled officers.  *Id.* at ¶ 115.  Plaintiff argues that since the adoption of this policy, she has been subject to arbitrary tests and evaluations, including another round of tests with her hearing aid.  *Id.* at ¶ 126.  For example, on April 2, 2016, the CHC found that she had sufficient hearing to adequately perform her daily work.  Reply Declaration of Colleen M. Meenan ("Meenan Reply Decl.") (Doc. 37), Ex. 8.  Nevertheless, on April 27, 2016, Plaintiff was directed to appear, once again, before the Deputy Chief Surgeon of the NYPD Medical Division who directed her, yet again, to the CHC and ordered her to undergo another series of tests and evaluations of her hearing.  Supp. Compl. ¶ 121.  On May 3, 2016, Plaintiff completed

the required testing at the CHC.  *Id.* at ¶ 125.  The CHC once again found that she had sufficient

hearing to adequately perform her daily work tasks.  Meenan Reply Decl. Ex. 9.  Still, Plaintiff

was subsequently directed to obtain additional testing and clearance from her private physician

and was told by the NYPD Medical Division that she would have to undergo another round of

testing with her hearing aid, despite having done so multiple times over the past six years.  *Id.* at

¶ 125-26.  To date, Plaintiff has undergone all of the tests ordered by the NYPD and is currently

awaiting the individualized assessment by the Medical Board.  *Id.* at ¶ 124.

      For the past five years, Plaintiff has been assigned clerical duties, is not permitted to

carry a firearm, or work overtime, and is not eligible for promotions or career advancement.  *Id.*

at ¶¶ 37-38.  Plaintiff filed a complaint with the Equal Employment Opportunity Commission

("EEOC") on February 25, 2015 against the City of New York, the New York City Police

Department, and the New York City Article II Medical Board alleging discrimination on the

basis of her disability and retaliation.  *Id.* at ¶ 98.  Attached to the EEOC complaint, Plaintiff

included "Charging Particulars" alleging similar facts and claims as those alleged in the instant

Complaint.[7]  On September 11, 2015, the EEOC issued Plaintiff a right to sue letter in which it

did not make a finding, but rather acknowledged that more than 180 days had elapsed and the

Commission had not filed a suit.  *Id.* at ¶ 99; Addendum to the Complaint (Doc. 5, Ex. 1).

## II.  Procedural History

      Plaintiff filed the Complaint on October 13, 2015.  (Doc. 5).  Defendants filed an Answer

on December 7, 2015.  (Doc. 17).  Although the case was automatically referred to mediation,

(Doc. 18), the parties were unsuccessful in reaching a resolution (Doc. 19).  On March 30, 2016,

---

[7] *See* EEOC Charge of Discrimination and Charging Particulars, Meenan Decl., Ex. 5.

Plaintiff sought leave to file a motion to supplement the Complaint to include claims regarding the NYPD policy adopted in December 2015, addressing hearing requirements for tenured police officers.  (Doc. 22).  The Court granted leave and Plaintiff filed the instant motion on June 6, 2016.  (Doc. 29).

## III.  <u>Legal Standard</u>

Parties are entitled to amend their pleadings once, as a matter of course, within 21 days after serving the pleading or, if a responsive pleading is required, within 21 days after service of a responsive pleading or a Rule 12 motion.  Fed. R. Civ. P. 15(a)(1).  A party may not otherwise amend its pleading without either the written consent of the opposing party or leave of the court.  Fed. R. Civ. P. 15(a)(2).  "The court should freely give leave when justice so requires."  *Id.*  The Supreme Court has held that it would be an abuse of discretion, "inconsistent with the spirit of the Federal Rules," for a district court to deny leave without some justification, "such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc."  *Foman v. Davis*, 371 U.S. 178, 182 (1962).

The Second Circuit has stated that a court should allow leave to amend a pleading unless the non-moving party can establish prejudice or bad faith.  *AEP Energy Servs. Gas Holding Co. v. Bank of Am., N.A.*, 626 F.3d 699, 725 (2d Cir. 2010) (quoting *Block v. First Blood Assocs.*, 988 F.2d 344, 350 (2d Cir. 1993)).  Motions to amend are ultimately within the discretion of the district courts, *Foman*, 371 U.S. at 182, and they should be handled with a "strong preference for resolving disputes on the merits."  *Williams v. Citigroup Inc.*, 659 F.3d 208, 212-13 (2d Cir. 2011) (quoting *New York v. Green*, 420 F.3d 99, 104 (2d Cir. 2005)) (internal quotation marks

omitted).  "Courts in this district have consistently granted motions for leave to amend a complaint where facts and allegations developed during discovery are closely related to the original claim and are foreshadowed in earlier pleadings."  *Stonewell Corp. v. Conestoga Title Ins. Co.*, No. 04 CV 9867 (KMW) (GWG), 2010 WL 647531, at *2 (S.D.N.Y. Feb. 18, 2010). Although permissive, the standard for leave to amend "is by no means 'automatic.'"  *Billhofer v. Flamel Technologies, S.A.*, No. 07 Civ. 9920, 2012 WL 3079186, at *4 (S.D.N.Y. July 30, 2012) (quoting *Klos v. Haskel*, 835 F. Supp. 710, 715 (W.D.N.Y. 1993)).

Leave to amend may also be denied on the basis of futility if the proposed claim would not withstand a Rule 12(b)(6) motion to dismiss.  *Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals*, 282 F.3d 83, 88 (2d Cir. 2002).  The party opposing the amendment has the burden of establishing its futility.  *Blaskiewicz v. Cnty. of Suffolk*, 29 F. Supp. 2d 134, 137-38 (E.D.N.Y. 1998) (citing *Harrison v. NBD Inc.*, 990 F. Supp. 179, 185 (E.D.N.Y. 1998)).

## IV.  Discussion

Plaintiff argues that the Court should allow her to amend the Complaint because (1) she has standing to challenge the new NYPD policy and (2) she properly exhausted her administrative remedies before bringing suit.  Plaintiff's Memorandum of Law in Support of Her Application for Leave to Supplement Her Complaint ("Pl. Memo.") (Doc. 30), at 1.  Defendants contend that Plaintiff does not have standing to bring her claim because she is still awaiting final judgment by the Medical Board of her evaluation under the new policy and has not exhausted her administrative remedies with respect to this new policy.  Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion to Supplement Her Complaint ("Def. Memo.") (Doc. 35), at 1-2.

## A. Standing

"Article III, § 2, of the Constitution restricts the federal 'judicial Power' to the resolution of 'Cases' and 'Controversies.'  That case-or-controversy requirement is satisfied only where a plaintiff has standing."  *Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 273 (2008) (citing *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332 (2006)).  "[I]n order to have Article III standing, a plaintiff must adequately establish:  (1) an injury in fact (*i.e.,* a concrete and particularized invasion of a legally protected interest); (2) causation (*i.e.,* a fairly traceable connection between the alleged injury in fact and the alleged conduct of the defendant); and (3) redressability (*i.e.*, it is likely and not merely speculative that the plaintiff's injury will be remedied by the relief plaintiff seeks in bringing suit)."  *Id.* at 273-74 (internal quotation marks and alterations omitted) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). If a party lacks Article III standing, a court has no subject matter jurisdiction to hear its claims. *Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 433 F.3d 181, 198 (2d Cir. 2005) (quoting *Steel Co. v. Citizens for a Better Env't*, 523 523 U.S. 83, 94 (1998)).

To satisfy the "injury-in-fact" requirement, Plaintiff must establish that she has suffered a palpable and distinct harm that affects her "in a personal and individual way."  *Lujan*, 504 U.S. at 560 n.1.  The "injury-in-fact" element of constitutional standing ensures that the plaintiff has a "personal stake" in the outcome of the litigation.  *Baker v. Carr*, 369 U.S. 186, 204 (1962); *see also Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 166 (1972) (stating that a party "has standing to seek redress for injuries done to him, but may not seek redress for injuries done to others."). Additionally, "[a] plaintiff seeking injunctive or declaratory relief cannot rely on past injury to satisfy the injury requirement but must show a likelihood that he or she will be injured in the

future." *DeShawn E. by Charlotte E. v. Safir*, 156 F.3d 340, 344 (2d Cir. 1998) (citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 105-06 (1983)); *see also Lujan*, 504 U.S. at 564 ("Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects." (internal quotation marks omitted) (quoting *Lyons*, 461 U.S. at 102)).

To support their objection, Defendants rely on Second Circuit caselaw finding that Article III standing is not met where "the challenged procedures have not been applied to the claimant, or where, after their application, the agency has not rendered a final decision adverse to the claimant." *Coffran v. Bd. of Trs. of N.Y. City Pension Fund*, 46 F.3d 3, 4 (2d Cir. 1994); *see also Toth v. McCall*, 213 F.3d 626, 626 (2d Cir. 2000) (summ. order) ("Where the agency in question has not rendered a final decision adverse to the claimant, the Article III requirement that there be an existing case or controversy has not been met."). A final determination has been deemed necessary to prevent an Article III court from entertaining "a claim which is based upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Coffran*, 46 F.3d at 4 (quoting *Oriental Health Spa v. City of Fort Wayne*, 864 F.2d 486, 489 (7th Cir. 1988)).

Here, the Court finds that Plaintiff has sufficiently alleged a cognizable injury to confer standing. Though the Court acknowledges that the Medical Board can ultimately reinstate Plaintiff to full duty status pursuant to the new policy, her claims regarding the policy suggest that her injury may not be entirely remedied by a favorable determination. Specifically, Plaintiff alleges that the newly adopted standard is "arbitrary, discretionary and gives no clear guidance as to the exact hearing measurements [she] must meet as a police officer" so that she can return to work. Supp. Compl. ¶ 128. As a result, although Plaintiff underwent a series of tests and

consultations before the new policy was implemented and was found by the CHC to have

hearing sufficient to perform her job with a hearing aid, Plaintiff alleges she was still forced to

return to the CHC and repeat testing without any explanation of what was required.  *Id.* at ¶¶

118, 123.  Moreover, even if Plaintiff is allowed to return to full duty today, the policy requires

recertification every two years.  Thus, here the "final" determination is in place for a limited time

and does not prevent Plaintiff from being subjected to the allegedly arbitrary standards in the

future.  As such, the Court finds that Plaintiff has sufficiently alleged a palpable and distinct

harm with respect to the new NYPD policy.

　　　For the same reason, Defendants' claim that Plaintiff cannot establish the causation and

redressability elements for Article III standing is also unavailing.  Def. Opp. at 5-6.  The Court

finds that Plaintiff has sufficiently alleged that she will be required to undergo an additional set

of tests for recertification in the future because of the new policy, and that by challenging the

policy by bringing this lawsuit, Plaintiff's injury can be adequately remedied.

　　　Accordingly, at this stage, Plaintiff's allegations are sufficient to confer standing to

challenge the new NYPD policy.

**B.  Exhaustion of Administrative Remedies**

　　　Defendants contend that even if Plaintiff has standing to bring her claims, Plaintiff did

not exhaust her administrative remedies, as required, because she did not file a complaint about

the new policy with the EEOC.  Def. Opp. at 8-9.  Before bringing a claim under Title I of the

ADA to federal court, Plaintiff must first exhaust her administrative remedies before the federal

EEOC or the equivalent state-level agency.  *See McInerney v. Rensselaer Polytechnic Inst.*, 505

F.3d 135, 138 (2d Cir. 2007); *Vargas v. Reliant Realty*, No. 13 Civ. 2341 (PGG), 2014 WL

4446165, at *9 (S.D.N.Y. Sept. 9, 2014).  The statute prescribes that "the claims forming the basis of [a federal suit] must, among other things, be presented in a complaint to the EEOC," and the plaintiff must obtain a "Notice of Right to Sue" letter from the EEOC.  *See Williams v. N.Y.C. Hous. Auth.*, 458 F.3d 67, 69 (2d Cir. 2006) (describing Title VII exhaustion requirements incorporated into the ADA).

"A plaintiff typically may raise in a district court complaint only those claims that either were included in or are 'reasonably related to' the allegations contained in her EEOC charge.  *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 82-83 (2d Cir. 2001) (citing *Butts v. City of New York Dep't of Hous. Pres. & Dev.*, 990 F.2d 1397, 1401 (2d Cir. 1993).  To determine whether a claim falls within the scope of the EEOC investigation, courts must focus on whether the complaint filed with the EEOC "gave that agency adequate notice to investigate discrimination" on the basis of the new claims.  *Acheampong v. N.Y. City Health & Hosps. Corp.*, No. 11 Civ. 9205 (LTS), 2015 WL 1333242, at *9 (S.D.N.Y. Mar. 25, 2015) (internal citations omitted).  Plaintiff alleges that her claims against the new policy are "reasonably related" to her allegations in the EEOC complaint because the NYPD's acts of discrimination under the new policy were "carried out in precisely the same manner" as she alleged in the EEOC complaint.  Pl. Memo. at 15; *see also Butts*, 990 F.2d at 1402-03; *Williams*, 458 F.3d at 70 and n.1.

The Court disagrees with Plaintiff.  The NYPD's previous policy of requiring "normal hearing" of its full duty officers, imposed a complete ban on officers that required a hearing aid.  As a result, and as Plaintiff experienced, upon a finding that an officer required a hearing aid, the Medical Board did not assess whether the officer was still able to perform his duties, but rather was obligated to recommend that the officer be separated from police service.  The new policy, however, allows for an evaluation of the officer's capabilities and provides guidelines as to what

13

information should be considered by the Medical Board.  It is precisely this new step in the policy that Plaintiff challenges.  Because the NYPD's policy did not exist at the time Plaintiff filed her EEOC complaint, her allegations concerning the new policy did not fall within the scope of the EEOC investigation.  *See, e.g., Floyd v. S. Westchester BOCES*, No. 14 Civ. 5842 (VB), 2015 WL 5459992, at *5 (S.D.N.Y. July 31, 2015) (stating that "allegations of new acts of discrimination, offered as the essential basis for the requested judicial review," do not fall within scope of EEOC investigation, and thus do not satisfy reasonably related test) (citing *Givens v. City of New York*, 2012 WL 75027, at *6 (S.D.N.Y. Jan. 10, 2012)).

Accordingly, the Court finds that Plaintiff has failed to exhaust her administrative remedies with respect to her claims based on the NYPD's new policy.  As such, Plaintiff's motion to amend the Complaint to assert these claims is DENIED.

## V.  Conclusion

For the reasons set forth above, Plaintiff's motion to amend the Complaint is DENIED. The Clerk of Court is respectfully directed to terminate the motion, Doc. 29.

It is SO ORDERED.

Dated:     November 15, 2016
           New York, New York

Edgardo Ramos, U.S.D.J.

14